## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| VICTORIA GREEN, as Administrator of the<br>Estate of Craigory Green, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20 C 463 |
| | ) | |
| STEVE MEEKS;<br>MOHAMMED SIDDIQUI; GAIL WALLS;<br>JOHN SHEPHERD; MICHAEL<br>MOLDENHAUER; VIPIN SHAH; ERIN<br>MEARS-ATTIG; RASHIDA POLLION;<br>MARY ZIMMER; BARBARA WINTER;<br>WEXFORD HEALTH SOURCES, INC.;<br>and UNKNOWN WEXFORD DOCTOR, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Hon. Nancy J. Rosenstengel,<br>District Judge |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

## THIRD AMENDED COMPLAINT

Plaintiff, Victoria Green, as Administrator of the Estate of Craigory Green, by and through her attorneys, Loevy & Loevy, complains of Defendants Steve Meeks, Mohammed Siddiqui, Gail Walls, John Shepherd, Michael Moldenhauer, Vipin Shah, Erin Mears-Attig, Rashida Pollion, Mary Zimmer, Barbara Winter, Wexford Health Sources, Inc., and Unknown Wexford Doctor, and states as follows:

### Introduction

1.     On October 28, 2018, Craigory Green died at Loyola University Medical Center in Maywood, Illinois, from primary sclerosing cholangitis (PSC), a rare disease that causes inflammation and scarring in the bile ducts within the liver. Craigory was just 30 years old.

2.      Craigory Green was diagnosed with possible PSC while in Cook County Jail in January 2011. Craigory's medical records reflecting the possible PSC diagnosis travelled with him to the Illinois Department of Corrections, but Defendants disregarded those records and other serious signs of Craigory's liver problems for several years, failing to provide the evaluations and treatment necessary to manage Craigory's disease.

3.      Yet by April 2018, Defendants were aware that Craigory had PSC and knew that a liver transplant was the only treatment that would save his life. Despite that knowledge, Defendants refused to provide him timely treatment, authorizing a liver transplant only when it was far too late.

4.      Because of Defendants' abhorrent conduct, Craigory was left to suffer a slow and painful death, as his body filled with the toxins that his liver was unable to process for elimination. Craigory repeatedly told medical staff that he wanted to fight his disease, but thanks to Defendants' conscious disregard of his deadly disease, he lost that fight.

## Jurisdiction and Venue

5.      This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1367.

6.      Venue is proper under 28 U.S.C. § 1391(b). On information and belief, one or more Defendants reside in this judicial district, and a substantial portion of the events giving rise to the claims asserted herein occurred within this district.

## Parties

7.     Plaintiff Victoria Green is the duly appointed Administrator of the Estate of Craigory Green. Craigory Green's estate was filed in the Probate Division of the Circuit Court of Cook County.

8.     At all times relevant to the events at issue in this case, Craigory Green was in the custody of the Illinois Department of Corrections (IDOC).

9.     At all times relevant to his involvement in this case, Defendant Steve Meeks was the Chief of Health Services for the IDOC. Defendant Meeks is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Meeks was acting under color of law and within the scope of his employment with the IDOC.

10.     At all times relevant to his involvement in this case, Defendant Mohammed Siddiqui was a physician at Menard Correctional Center (Menard), an employee of and final policymaker for Wexford, and was responsible for the implementation, oversight, and supervision of policies and practices at Menard. Defendant Siddiqui is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Siddiqui was acting under color of law and within the scope of his employment with Wexford.

11.     At all times relevant to her involvement in this case, Defendant Gail Walls was the healthcare unit administrator at Menard, and was responsible for the implementation, oversight, and supervision of policies and practices at Menard. Defendant Walls is sued here in her individual capacity. At all times

relevant to the events at issue in this case, Defendant Walls was acting under color of law and within the scope of her employment with the IDOC.

12.    At all times relevant to his involvement in this case, Defendant John Shepherd was a physician at Menard, an employee of and final policymaker for Wexford, and was responsible for the implementation, oversight, and supervision of policies and practices at Menard. Defendant Shepherd is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Shepherd was acting under color of law and within the scope of his employment with Wexford.

13.    At all times relevant to his involvement in this case, Defendant Michael Moldenhauer was a nurse practitioner at Menard. Defendant Moldenhauer is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Moldenhauer was acting under color of law and within the scope of his employment with the IDOC.

14.    At all times relevant to his involvement in this case, Defendant Vipin Shah was a physician working for Wexford at Menard. Defendant Shah is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Shah was acting under color of law and within the scope of his employment with Wexford.

15.    At all times relevant to her involvement in this case, Defendant Erin Mears-Attig was a registered nurse at Menard. Defendant Mears-Attig is sued here in her individual capacity. At all times relevant to the events at issue in

4

this case, Defendant Mears-Attig was acting under color of law and within the scope of her employment with the IDOC.

16.     At all times relevant to her involvement in this case, Defendant Rashida Pollion was a nurse practitioner at Menard. Defendant Pollion is sued here in her individual capacity. At all times relevant to the events at issue in this case, Defendant Pollion was acting under color of law and within the scope of her employment with Wexford.

17.     At all times relevant to her involvement in this case, Defendant Mary Zimmer was a registered nurse at Menard. Defendant Zimmer is sued here in her individual capacity. At all times relevant to the events at issue in this case, Defendant Zimmer was acting under color of law and within the scope of her employment with the IDOC.

18.     At all times relevant to her involvement in this case, Defendant Barbara Winter was a nurse at Menard. Defendant Winter is sued here in her individual capacity. At all times relevant to the events at issue in this case, Defendant Winter was acting under color of law and within the scope of her employment with either the IDOC or Wexford.

19.     Defendant Wexford Health Sources, Inc. (Wexford) is a corporation headquartered in Pennsylvania transacting business in Illinois. Wexford, pursuant to a contract with the state of Illinois, is a healthcare provider for IDOC prisons throughout the State. At all times relevant to the events at issue in this case, Wexford was responsible for the implementation, oversight, and

supervision of policies and practices at Menard and the IDOC generally. As an agent of IDOC, Wexford was at all times relevant to the events at issue in this case acting under color of law by and through its lawful agents, including the individual Defendants and other unknown healthcare employees at Menard.

### Allegations

20.     During the summer of 2010, while at the Cook County Jail, Craigory Green was admitted to John H. Stroger Jr. Hospital with complaints of sharp abdominal pains, yellowed eyes and skin (jaundice), nausea and vomiting, and unintended weight loss. Medical staff determined that Craigory needed his gallbladder removed, a surgery referred to as a laparoscopic cholecystectomy (or "lap chole" for short). The surgery was performed on July 30, 2010 and was a success.

21.     In the weeks and months that followed, Craigory's tests showed that certain enzymes in his liver remained elevated following surgery.

22.     In 2011, a biopsy of Craigory's liver was performed. The biopsy showed that Craigory likely suffered from primary sclerosing cholangitis. Doctors prescribed Ursodiol and recommended that Craigory's diagnosis be confirmed through further tests of his liver function.

23.     Primary sclerosing cholangitis (PSC) is a rare disease that affects a patient's bile ducts—the vessels that carry digestive liquid bile from a patient's liver to his small intestine for elimination. PSC causes the vessels to become inflamed, and the scar tissue that develops as a result restricts the ability of those vessels to carry the digestive liquid to the intestine for elimination. The

cause of PSC is not known, although there appears to be a genetic component to the disease. PSC typically progresses slowly, but will eventually result in death as the obstructed vessels eventually cause the liver to fail. The only treatment is a liver transplant. The status of a PSC patient's liver requires close monitoring through liver function tests, which help inform when and what priority a patient has on the transplant list. That list is ordered primarily according to patients' MELD (Model for End-Stage Liver Disease) scores, which is based on a patient's total Bilirubin levels and Creatinine levels, among other things.

24.     Staff at Stroger prescribed a medication called Ursodiol for Craigory, which helped stabilize his liver, and after beginning the medication his liver levels became less elevated.

25.     On September 14, 2012, Craigory was transferred to Stateville Northern Reception Center (NRC). He brought with him medical records from Stroger, including medical records indicating a likely diagnosis of PSC.

26.     At NRC, Craigory was seen by Nurse Marge Clauson, who reviewed the records from Stroger, noted that he had undergone a liver biopsy in 2011, and noted his 2010 lap chole. Nurse Clauson also noted that Craigory had had elevated liver function test results since his surgery. Nurse Clauson referred Craigory for an urgent physical examination by a doctor.

27.     But Craigory did not see a physician for nearly two weeks, until September 27. That same day, he was transferred from NRC to Menard Correctional Center, where staff noted that Craigory required a follow-up

appointment to address an earlier test that found that Craigory's levels of alkaline phosphatase—an enzyme found in the liver—were abnormally high.

28.     On October 24, 2012, Craigory's blood was drawn for a comprehensive metabolic panel. That panel showed concerningly high levels of AST and ALT— enzymes found primarily in the liver. The University of Illinois lab report indicated that while AST and ALT levels normally vary between 10-40 u/l and 10-50 u/l, respectively, Craigory's AST and ALT levels were 128 and 183.

29.     On October 26, 2012, Dr. John Shepherd saw Craigory. He noted Craigory's elevated AST and ALT levels, as well as his lap chole. But Dr. Shepherd failed to review Craigory's records from Stroger, apparently believing that they were not in the file. Dr. Shepherd noted that the records should be gathered and that Craigory should be seen by a physician in two weeks, after the records were collected. He also ordered a liver profile for Craigory.

30.     Despite Dr. Shepherd's recognition of the importance of Craigory's records from Stroger, neither he nor any other member of the medical staff at Menard took action to obtain any medical records from Stroger Hospital.

31.     The November 14, 2012 liver profile ordered by Dr. Shepherd showed that Craigory's AST and ALT levels were 113 and 211, respectively.

32.     On November 21, 2012, Defendant Unknown Wexford Doctor reviewed Craigory's November 14 liver profile test results and Dr. Shepherd's October 26 note. Yet Defendant Unknown Wexford Doctor took no steps to follow up with

Craigory, obtain other medical records from Stroger, perform additional evaluations, or provide Craigory any treatment.

33.     Instead, Craigory's serious liver issues went ignored by medical staff for years after the November 14, 2012 visit.

34.     On March 16, 2015, Craigory arrived in the healthcare unit at Menard because the bottoms of feet were itching and peeling. Itchy skin, especially in the hands and feet, is a common symptom of liver problems, including PSC. Nurse Barbara Winter recorded Craigory's complaints but took no action to ensure that Craigory was given access to a doctor for further evaluation or treatment. To the contrary, despite using a protocol that directed Nurse Winter to refer the patient to a doctor "always," Nurse Winter did not refer Craigory to any physician or mid-level provider, providing him only an anti-fungal cream to use for two weeks.

35.     On April 18, 2015, a certified medical technician saw Craigory in the healthcare unit again for a complaint of itching on the bottoms of his feet. The certified medical technician noted that the skin on Craigory Green's feet and groin was dry, flaky, and cracked with fissures and open sores. The technician referred Craigory to a doctor.

36.     On May 24, 2015, Craigory was seen by Nurse Practitioner Rashida Pollion. Nurse Practitioner Pollion noted Craigory's complaints, and Craigory's report that the anti-fungal cream did not provide any relief. Yet Nurse Practitioner Pollion did not order a liver function test or any other test to

evaluate the current state of Craigory's liver, and she took no action to provide treatment for Craigory's underlying condition.

37.     On July 28, 2017, Dr. Vipin Shah conducted a physical exam of Craigory. He noted that Craigory had a history of elevated liver levels and ordered a repeat liver function test. Yet Dr. Shah ordered no follow-up appointment to ensure that the liver function test results would be reviewed with Craigory as appropriate, and a treatment plan determined.

38.     On August 3, 2017, a liver function test was conducted, which showed that Craigory's AST and ALT levels were 128 and 164, respectively. His Bilirubin totals were 2.8 mg/dl, more than double the normal limits.

39.     On August 4, 2017, Nurse Practitioner Michael Moldenhauer reviewed Craigory's lab results. He noted Craigory's high liver levels, but failed to take any steps to evaluate or treat Craigory. Instead, he simply directed that Craigory's lab results should be filed with Craigory's medical records.

40.     More than a year passed before Craigory received any further attention from medical staff. On April 10, 2018, Mr. Green was seen by Nurse Erin Mears-Attig. Nurse Mears-Attig failed to accurately document her encounter with Craigory. Additionally, despite being made aware of Craigory's past medical history, Nurse Mears-Attig failed to review Craigory's prior medical records, which make clear Craigory's long history with obvious, serious liver issues. And although Nurse Mears-Attig recognized that Craigory should be

referred to a physician, she took no action to schedule an appointment for Craigory or otherwise ensure that Craigory was seen by a physician.

41.     On April 12, 2018, a comprehensive metabolic panel of Craigory's blood showed elevated levels of AST and ALT of 220 and 204, respectively. Craigory's Bilirubin totals were now even higher, at 5.8.

42.     On April 17, 2018, Advanced Practice Nurse Mary Zimmer saw Craigory after Craigory submitted a sick call request regarding his lab results. Nurse Zimmer noted that Craigory's eyes appeared yellow, a clear sign of severe liver damage, and abnormal AST and ALT levels. Nurse Zimmer recognized that Craigory should be referred to a physician's assistant, but took no action to schedule an appointment for Craigory or otherwise ensure that Craigory was seen by the physician's assistant.

43.     On May 15, 2018, Nurse Mears-Attig noted that both of Craigory's eyes were yellow.

44.     Between September 14, 2012 and May 22, 2018, Craigory repeatedly and consistently reported the fact that he had primary sclerosing cholangitis to medical staff at Menard. Despite that report, Defendants repeatedly and consistently failed to respond to Craigory's reports, either through evaluation and treatment, or by obtaining the medical records from Stroger, which would have confirmed his reports.

45.     On May 22, 2018, Craigory was sent to Southern Illinois Memorial Hospital in Carbondale, Illinois. Hospital staff promptly obtained his medical

11

records at Cook County Jail, which verified Craigory's diagnosis of PSC. Doctors performed a liver function test, which showed that Craigory's AST and ALT levels were high, 447 and 249, and that his Bilirubin score had increased from 9.3 to 15.1 (more than 15 times the normal amount) in less than three weeks. Doctors at the hospital prescribed Craigory Ursodiol and transferred him to St. Louis University Hospital to be evaluated for a liver transplant.

46.     On May 24, 2018, Craigory was examined by Dr. Thomas Heitker at St. Louis University Hospital, who noted Craigory's PSC diagnosis. Dr. Steve Meeks, however, told Dr. Heitker that St. Louis University Hospital was not permitted to evaluate Craigory's eligibility for a liver transplant. Another doctor spoke with Wexford utilization management physician Dr. Hector Garcia, who instructed hospital staff that if Craigory needed a prolonged hospitalization or liver transplant evaluation, it would have to be conducted at the University of Illinois at Chicago (UIC). Accordingly, Dr. Heitker discharged Craigory back to Menard on May 29, advising Craigory and staff at Menard that Craigory required close evaluation by a liver specialist to determine Craigory's eligibility for a transplant.

47.     Upon Craigory's return to Menard, Nurse Lee Gregson noted that paperwork from St. Louis University Hospital was put in the "med furlough box" at Menard. And although on May 31, 2018, Dr. Siddiqui noted that there were "no notes" regarding Craigory from the hospital, there is no indication that Dr. Siddiqui took any steps to obtain them.

48.     During the weeks that followed, nursing staff at Menard noted that Craigory was visibly jaundiced with yellow eyes, and suffering swelling in his legs, all signs of advanced PSC. Yet Dr. Siddiqui did not see Craigory until July 20, 2018, nearly two months after Craigory returned from St. Louis University Hospital.

49.     During the July 20 encounter, Dr. Siddiqui noted that Craigory had end-stage organ failure and would need a transplant. He also noted Craigory's jaundice. He determined that Craigory needed to be referred to a specialist to evaluate Craigory's eligibility for a transplant. Finally, Dr. Siddiqui again noted that he did not have records from St. Louis University Hospital, and at last ordered staff to collect them.

50.     The following week, Dr. Siddiqui and administrative staff at Menard discussed transferring Craigory to Stateville Correctional Center so that he could be evaluated at UIC. Dr. Siddiqui also discussed Craigory's case with Dr. Meeks, who was made aware of Craigory's need for a liver transplant. Dr. Siddiqui also called the warden's office to inquire about transferring Craigory to Stateville so that he could be evaluated for a liver transplant.

51.     By July 26, 2018, his AST and ALT levels had climbed to 551 and 274, and his Bilirubin totals were now 23.8.

52.     Defendants told staff at UIC that neither they nor the IDOC would pay for any liver transplant procedure for Craigory. Defendants also told Craigory that he would not receive a transplant because of his status as a prisoner.

53.     On July 31, 2018, Craigory was sent back to Southern Illinois
Memorial Hospital with severe abdominal pain, swelling, and shortness of
breath. Doctors at the hospital determined that these symptoms were caused by
a buildup of fluid that was in turn caused by the advanced state of Craigory's
PSC. Doctors determined that his MELD score—which ranges from 6 to 40 or
more based on the advanced stage of disease—was 34. Hospital staff noted that
UIC had determined that Craigory was not a candidate for a liver transplant
because the "prison [was] unwilling to pay for a transplant."

54.     While at Southern Illinois Memorial Hospital, Craigory asked for help
with pursuing a liver transplant. Staff told Craigory that there "are limited
options we can offer," or words to that effect. Craigory's medical records reflect
that he responded in substance: "What am I supposed to do now? Just sit here
and die?" Craigory was 30 years old.

55.     Hospital staff told Craigory about the advanced state of his PSC and
the lack of treatment options available to him. Craigory indicated that he
"plan[ned] to fight" his denial of treatment and would not give up on pursuing a
liver transplant. Staff noted that Craigory understood the severity of his
condition but was "having difficulty accepting that there are no options for
treatment."

56.     Around this time, Plaintiff also began contacting IDOC staff to
advocate for Craigory, asking that he be transferred to a hospital closer to his
family, and that he be permitted to undergo the liver transplant procedure. At

14

some point during these frequent phone calls, Craigory called Plaintiff and told her "these people going to let me die down here," or words to that effect.

57.     Hospital staff discharged Craigory on August 7, with instructions that Craigory needed to follow up with a gastrointestinal specialist for monitoring.

58.     After his return to Menard, Dr. Siddiqui again noted the extensive conversations that he had had with Dr. Meeks about Craigory's dire need for a liver transplant, and Dr. Meeks's refusal to approve him for one. On August 9, 2018, Dr. Siddiqui described Craigory's prognosis as dismal.

59.     On August 9 and 10, Dr. Siddiqui again notified Dr. Meeks about Craigory's "very dismal" prognosis.

60.     On August 10, 2018, Craigory was again sent to Southern Illinois Memorial Hospital for hepatic encephalopathy—a decline in brain function, caused by a liver so damaged that it could not remove toxins from Craigory's body. Records from the hospital demonstrate that Craigory was quickly deteriorating from the PSC. Craigory was extremely confused, his abdomen was visibly distended, his eyes were severely jaundiced, and his lower limbs were swollen. At the time of his admission, Craigory's Bilirubin score was 25.3, and his AST and ALT levels were 527 and 227.

61.     Doctors at the hospital noted that Craigory had end-stage liver disease caused by the PSC, but "[b]ecause patient is an inmate," he had been denied a liver transplant. The prognosis was "extremely poor without liver transplant."

15

62.     During his hospital stay, Craigory's confusion and disorientation improved. He continued to tell hospital staff that he wanted a liver transplant.

63.     On August 11, hospital staff determined that Craigory had a MELD score over 30. Hospital staff notified Dr. Meeks of Craigory's health status. He was discharged back to Menard on August 13. Staff from the Gastroenterology Department at Southern Illinois Memorial Hospital, who had monitored Craigory closely during his admission at the hospital, requested that Craigory follow up with them after being discharged.

64.     Upon his return to Menard, Craigory was admitted to the prison infirmary, where Dr. Siddiqui diagnosed him with end-stage liver disease. Dr. Siddiqui raised Craigory's dire medical status again with Dr. Meeks. Dr. Siddiqui asked Dr. Meeks to let him know if Dr. Meeks changed his mind about refusing to allow Craigory to be evaluated at UIC for eligibility for a liver transplant.

65.     The next day, Dr. Siddiqui again notified Dr. Meeks of Craigory's health status, this time joined on the telephone with Menard Health Care Unit Administrator Gail Walls. Dr. Siddiqui told Dr. Meeks that Craigory was stable enough for a transfer to UIC to assess his eligibility for a liver transplant.

66.     On August 16, Dr. Siddiqui noted that Craigory's confusion and hepatic encephalopathy had returned. That same day, Dr. Siddiqui received approval by Wexford staff to refer Craigory to a gastroenterologist to treat the obvious and severe gastrointestinal issues he was suffering as a result of his

end-stage liver disease. Yet neither Health Care Unit Administrator Walls nor Medical Furlough Clerk E. Prange took steps to ensure that Craigory's appointment occurred for more than a month after Wexford approved the appointment. Given Craigory's obviously grave condition, this was patently inappropriate.

67.     On August 22, Dr. Siddiqui noted that he was still waiting for information from Dr. Meeks about whether Dr. Meeks would permit Craigory to transfer to UIC to evaluate and treat his end-stage liver disease.

68.     While waiting for Dr. Meeks to reach a decision, Craigory continued to deteriorate. On August 26, Nurse Pam Hanna noted that Craigory's eyes were becoming more yellow, a sign that the disease was becoming even more advanced. That same day, Dr. Siddiqui reflected that Craigory appeared "deeply jaundiced." On September 1, infirmary staff at Menard noted that Craigory was "totally disoriented" and was severely jaundiced.

69.     Craigory was sent back to Southern Illinois Memorial Hospital, where staff noted his altered mental status and severe jaundice. Physicians at the hospital additionally determined that as a result of a uterine tract infection (UTI) that had occurred as a result of Craigory's failing liver, he was severely septic as well.

70.     Staff also noted that Craigory's abdomen was sunken and concave, a sign of malnutrition. His Bilirubin score upon admission was 33.2 and his AST and ALT levels were 851 and 487.

71.     Hospital staff treated Craigory's sepsis and UTI. Craigory's mental status also improved. Craigory was discharged back to Menard on September 4.

72.     But after just a few days at Menard, Craigory's health again decompensated. By September 8, Craigory's abdomen was again hard and distended, he was complaining of pain and itching all over his body, and he was experiencing diarrhea.

73.     Craigory was sent back to Southern Illinois Memorial Hospital, where staff determined that he was suffering acute renal failure as a result of his end-stage liver disease. His blood pressure was dangerously low—99/55—and his Bilirubin score was 35.7.

74.     Staff at Southern Illinois Memorial Hospital determined that Craigory's MELD score was 38, and that he had approximately 3 months left to live. Dr. Varun Yadav determined, in consultation with the Gastroenterology Department, that Craigory was a candidate for a liver transplant, and should be transferred to a tertiary care level facility for a liver transplant ASAP.

75.     Craigory remained at Southern Illinois Memorial Hospital from September 8 through September 20. Staff noted that he was anxious and fearful about his ability to survive. On September 13, Craigory told the hospital's social worker that he was upset because Defendants had not informed him of the dire nature of his health. The social worker also notified Defendants and staff at Menard about Craigory's health status.

76.     Defendants did not begin to search for a facility to evaluate Craigory's eligibility for a liver transplant until September 13, 2018—long after his test results and MELD score qualified him for placement on the UNOS waiting list.

77.     When Craigory returned to Menard on September 20, 2018, Defendants took no action to expedite their request. Instead, on September 26, Dr. Siddiqui simply noted that he was waiting to hear from St. Louis University Hospital about whether they would accept Craigory as a patient for purposes of a liver transplant.

78.     When St. Louis University Hospital refused his transfer, Dr. Siddiqui removed Craigory's medical hold, which allowed him to be transported North to Stateville so he could be near hospitals like Loyola University Medical Center, who was willing to perform Craigory's liver transplant. Yet Defendants still took no action to actually transfer Craigory to Loyola, or to seek another hospital where Craigory could be evaluated and treated.

79.     Unsurprisingly, Craigory again decompensated in the days that followed. After a marked increase in dizziness and confusion, Craigory was again transferred to Southern Illinois Memorial Hospital on October 1, 2018. At the time of his admission, Craigory had a Bilirubin score of over 54,[1] ALT and AST levels of 273 and 710, and a MELD score of 40. Craigory was so ill that he could not speak to medical staff.

---

[1] Southern Illinois Memorial Hospital's equipment is apparently not able to assess Bilirubin scores of more than 54.0.

80.     On or about October 3, 2018, Defendants finally approved Craigory for a liver transplant. Doctors at Southern Illinois Memorial Hospital contacted Loyola, who agreed to accept Craigory as a transfer patient pending information from Defendants regarding payment and approval. Nursing staff notified Defendant Walls about the urgent need for this information. During the phone call with nursing staff at Southern Illinois Memorial Hospital, Defendant Walls acknowledged that Craigory's health had required a transfer to Stateville much earlier.

81.     On October 4, 2018, Craigory was admitted to Loyola's Medical Intensive Care Unit (MICU), where medical staff began performing tests and examinations to confirm Craigory's eligibility for a liver transplant.

82.     Medical staff at Loyola determined that Craigory's MELD score was above 40, indicating an urgent need for a liver transplant. Accordingly, staff housed Craigory in the hepatology wing of the hospital on an inpatient basis while he awaited a transplant evaluation and approval.

83.     Craigory's liver transplant evaluation at Loyola included extensive laboratory tests, imaging, heart tests, nutrition counseling, and consultations with social workers.

84.     Loyola's tests revealed that Craigory's MELD score remained at or above 39. As was the case during his previous hospitalizations, his AST and ALT levels and Bilirubin score remained extremely high.

20

85.     On October 12, 2018, Loyola's Liver Transplantation Medical Review Board notified Craigory that he would be placed on the United Network for Organ Sharing (UNOS) wait list for a liver transplant pending insurance approval.

86.     Wait times for liver transplants are determined primarily by the severity of the patient's illness, with the sickest patients receiving highest priority. Patients who are added to the UNOS wait list with end stage liver disease as severe as Craigory's typically receive a liver transplant within a matter of months.

87.     While Craigory was waiting for his transplant, his health continued to deteriorate. He began to experience respiratory problems that persisted despite multiple thoracenteses. His MELD score jumped to 45 on October 20 and then to 50 on October 22. Craigory's decompensated cirrhosis also began interfering with his kidney function, causing him to become highly uremic.

88.     On October 22, 2018, as a result of his end-stage liver disease, Craigory's renal system was in rapid decline. Although doctors administered a dialysis catheter, his condition continued to worsen. The failure of Craigory's renal system caused sudden, severe respiratory problems, and he became confused and disoriented as a result of hepatic encephalopathy. Doctors intubated him and transferred him back to MICU.

89.     At that point, even though Craigory's prognosis was extremely poor, the police officers guarding Craigory specifically instructed that his family should not be notified about his dire medical condition.

90.     Laboratory tests conducted on October 23 revealed that his levels of ALT and AST had leaped to 1,170 and 4,692, respectively.

91.     Craigory's rapid deterioration on and around October 22 was the direct result of the Defendants' failure to appropriately monitor his liver function following his PSC diagnosis or provide appropriate medical care within a reasonable time after learning that he urgently needed a liver transplant.

92.     Once Craigory's condition had deteriorated so significantly that he had to be admitted to the MICU, he was critically ill and clinically unstable, meaning that he was no longer an appropriate transplant candidate.

93.     Craigory remained in the MICU, intubated and sedated, for the next six days, while he experienced septic shock from a urinary tract infection, severe acidosis from his renal failure, and acute respiratory failure caused by the acidosis.

94.     Eventually, members of Craigory's family were notified of his condition and permitted to visit him.

95.     Craigory died on October 28, 2018. An autopsy conducted by the Cook County Medical Examiner identified his cause of death as complications of hepatic cirrhosis caused by Craigory's PSC.

## COUNT I
### 42 U.S.C. § 1983 – Denial of Medical Care (Eighth Amendment)
### All Defendants

96.     Each of the Paragraphs of this Complaint is incorporated herein.

97.     In the manner described more fully above, Defendants were aware of Craigory Green's medical needs and the seriousness of his medical needs, and knew the risk of harm to Mr. Green if he did not receive appropriate medical care. Despite that knowledge, Defendants failed to provide him with proper medical care or access to medical care, in violation of the Eighth Amendment to the United States Constitution.

98.     As a result of Defendants' unjustified and unconstitutional conduct, Mr. Green experienced injuries, including but not limited to pain, suffering, emotional distress, and death.

99.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and/or with reckless indifference to Mr. Green's rights.

100.    Alternatively, Defendants were deliberately indifferent to Mr. Green's objectively serious medical needs, and their actions were undertaken intentionally, with malice, and/or reckless indifference to Mr. Green's rights.

101.    Mr. Green's injuries, including but not limited to pain and suffering, emotional distress, and death were proximately caused by policies and practices of Defendants.

102.    Mr. Green's injuries were proximately caused by the policies and practices of Defendant Wexford Health Sources, Inc.

23

103.    At all times relevant to the events at issue in this case, Defendant Wexford contracted with the IDOC to provide healthcare to men housed in IDOC prisons, including Mr. Green. As the provider of healthcare services, Wexford was responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding the provision of medical care to prisoners in IDOC custody.

104.    Prior to the events giving rise to Plaintiff's Complaint, Defendant Wexford had notice of widespread policies and practices by healthcare and correctional staff at Stateville and Menard pursuant to which prisoners like Mr. Green with serious medical needs were routinely denied medical care and access to medical care. It is common within the IDOC to see prisoners with clear symptoms of serious medical needs whose medical records reflect an obvious need for treatment whose medical treatment are routinely delayed or completely ignored by healthcare and correctional employees.  Despite knowledge of these problematic policies and practices, Defendant Wexford did nothing to ensure that prisoners in IDOC received adequate medical care and access to medical care, thereby acting with deliberate indifference.

105.    Specifically, there exist policies or widespread practices in IDOC pursuant to which prisoners receive unconstitutionally inadequate healthcare, including policies and practices pursuant to which: (1) healthcare personnel commonly fail to respond or follow up on complaints by prisoners about their health status; (2) healthcare personnel fail to review relevant medical records as

part of a patient's treatment plan; (3) healthcare personnel fail to create a sensible treatment for patients whose health status require the creation of a treatment plan; (4) healthcare personnel fail to schedule follow-up appointments deemed appropriate by members of the medical staff; (5) healthcare personnel fail to take action to secure continuity of care among correctional facilities within the IDOC and other healthcare providers; (6) inadequate levels of health care staffing are maintained; and (7) healthcare personnel fail to refuse to arrange for prisoners to be treated in outside facilities, even when an outside referral is necessary or proper.

106.  These widespread policies and practices were allowed to flourish because Defendant Wexford, which directs the provision of healthcare services within the IDOC, directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional employees, and failed to adequately punish and discipline prior instances of similar misconduct. In this way, Defendant Wexford violated Mr. Green's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

107.  The above-described practices, so well-settled as to constitute de facto policy within the IDOC, were able to exist and thrive because Defendant Wexford was deliberately indifferent to the problem, thereby effectively ratifying it.

108.    Wexford also acted to violate Mr. Green's constitutional rights through denials of medical care by persons delegated with final policymaking authority by Defendant Wexford.

109.    Mr. Green's injuries were caused by employees of IDOC and Wexford, including but not limited to the individually named Defendants, who acted pursuant to the foregoing policies and practices in engaging in the misconduct described above.

## COUNT II
### 42 U.S.C. § 1983 – Conspiracy
### All Defendants

110.    Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

111.    Defendants reached an agreement among themselves to deprive Mr. Green of his constitutional rights and to protect one another from liability for depriving Mr. Green of his rights, all as described in the various paragraphs of this Complaint.

112.    In the furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

113.    The misconduct described in this Count was undertaken intentionally, with malice, and/or with reckless indifference to Mr. Green's rights.

114.    As a direct and proximate result of the illicit prior agreement referenced above, Mr. Green's rights were violated and he suffered injuries, including but not limited to emotional distress and death.

115.    Mr. Green's death was caused by employees of the IDOC and Wexford, including but not limited to the individually named Defendants, who acted pursuant to the policies and practices described more fully above.

## COUNT III
## 42 U.S.C. § 1983 – Failure to Intervene (Eighth Amendment)
## All Defendants

116.    Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

117.    In the manner more fully described above, Defendants had reasonable opportunity to prevent the violation of Mr. Green's constitutional rights as set forth above had they been so inclined, but failed to do so.

118.    Defendants' failures to act were intentional, done with malice, and/or done with reckless indifference to Mr. Green's rights.

119.    As a direct and proximate result of the illicit prior agreement referenced above, Mr. Green's rights were violated and he suffered injuries, including but not limited to emotional distress and death.

120.    Mr. Green's death was caused by employees of the IDOC and Wexford, including but not limited to the individually named Defendants, who acted pursuant to the policies and practices described more fully above.

## COUNT IV – State Law Claim
## Wrongful Death
## All Defendants

121.    Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

27

122.    In the manner more fully described above, the actions of the Defendants breached the duty of care owed to inmates in their care. They did so by negligently ignoring Mr. Green's request for medical attention.

123.    Alternatively, the actions of the Defendants were willful and wanton in that they demonstrated an utter indifference to the safety of others. Defendants were conscious that an injury would probably result from the above-described course of action and recklessly disregarded the consequences of those actions.

124.    As a direct and proximate result of Defendants' negligence and/or willful and wanton conduct, Mr. Green suffered injuries, including death.

125.    Defendants' actions were undertaken willfully, wantonly, and with reckless indifference or conscious disregard for the safety of others.

126.    Defendants' actions proximately caused Mr. Green great bodily harm and death, as well as great pain and suffering.

127.    Plaintiff Victoria Green, and all other legally recognized family members, claim damages for the wrongful death of Mr. Green, and for the loss of his services, protection, care, future income, assistance, society, companionship, comfort, guidance, counsel and advice, and for the mental anguish caused by this loss, as well as for funeral expenses pursuant to 740 ILCS § 180/1, the Illinois Wrongful Death Act.

### COUNT V – State Law Claim
### Survival Action
### All Defendants

128.    Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

129.    In the manner more fully described above, the actions of the Defendants breached the duty of care owed to inmates in their care. They did so by ignoring Mr. Green's request for medical attention.

130.    Alternatively, the actions of Defendants were willful and wanton in that they demonstrated an utter indifference to the safety of others. Defendants were conscious that an injury would probably result from the above-described course of action and recklessly disregarded the consequences of those actions.

131.    The misconduct described in this Count was undertaken with intentional disregard of Mr. Green's rights.

132.    As a direct and proximate result of Defendants' negligence and/or willful and wanton conduct, Mr. Green suffered great conscious pain and suffering prior to his death.

133.    Mr. Green filed no action during his lifetime, but under the law of the State of Illinois, this action survives and may be asserted by his Estate.

134.    Plaintiff Victoria Green, on behalf of the Estate of Craigory Green, claims damages for the conscious pain and suffering of Mr. Green, pursuant to 755 ILCS § 5/27-6, commonly referred to as the Illinois Survival Act.

## COUNT VI
### Respondeat Superior
### Defendant Wexford

135.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

136.    In committing the acts alleged in the preceding paragraphs, the above-described Defendants were employees, members, and agents of Wexford, acting at all relevant times within the scope of their employment.

137.    Consequently, Defendant Wexford is liable for the actions of its employees acting within the scope of their employment under state law.

138.    Defendant Wexford, as private corporation acting under color of state law, should additionally be held liable under 42 U.S.C. § 1983 for the conduct of its employees acting within the scope of their employment. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 793-95 (7th Cir. 2014).

WHEREFORE, Plaintiff Victoria Green, as Administrator of the Estate of Craigory Green, hereby respectfully requests that this Court enter a judgment in her favor and against Defendants Steve Meeks, Mohammed Siddiqui, Gail Walls, John Shepherd, Michael Moldenhauer, Vipin Shah, Erin Mears-Attig, Rashida Pollion, Mary Zimmer, Barbara Winter, Wexford Health Sources, Inc., and Unknown Wexford Doctor, awarding compensatory damages, punitive damages, attorneys' fees and costs, and any other relief that this Court deems just and appropriate.

## **JURY DEMAND**

Plaintiff Victoria Green hereby demands a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure on all issues so triable.

Dated:       July 28, 2020

Respectfully submitted,

/s/ John Hazinski
John Hazinski
Attorney for Plaintiff


Arthur Loevy
Jon Loevy
Sarah Grady
Steve Weil
John Hazinski
LOEVY & LOEVY
311 North Aberdeen St., 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
sarah@loevy.com