IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| VICTORIA GREEN, as Administrator of the Estate of Craigory Green, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 20 C 0463 |
| STEVE MEEKS, et al., | ) ) | Hon. Stephen P. McGlynn |
| Defendants. | ) ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO THE WEXFORD DEFENDANTS' MOTION FOR EXTENSION OF TIME, MOTION FOR RECONSIDERATION, AND <u>MOTION FOR LEAVE TO SUPPLEMENT</u>**

Plaintiff Victoria Green, through her counsel at Kaplan & Grady LLC, respectfully submits the following consolidated response in opposition to the Wexford Defendants' flurry of motions and attachments filed in the wake of the Court's discovery Order (Dkt. 212): Motion for Extension of Time (Dkt. 214), Motion for Reconsideration (Dkt. 215), Motion for Leave to File Supplemental Motion to Reconsider Court's Order (Dkt. 216), and Corrected Exhibit A (Joe Ebbitt Affidavit) to the Motion for Leave (Dkt. 217), stating as follows:

**INTRODUCTION**

In the evening on the day its production was due, and without conferring with Plaintiff, the Wexford Defendants ("Wexford") moved the Court for an extension of time to comply with the Court's discovery Order (Dkt. 214) and for reconsideration of a portion of the Order (Dkt. 215). *See* Order at Dkt. 212. As Plaintiff was preparing to file her response to Wexford's first two motions, Wexford filed another motion: a 9-page Motion for Leave to File Supplement Motion to Reconsider Court's Order (Dkt. 215) and a Corrected Exhibit A to the Motion (Dkt. 217). Wexford's Motions are vexatious and an affront to core principles of litigation and should be

denied in full. In addition, the Court should order Wexford to pay Plaintiff its reasonable attorney's fees as a sanction for its failure to respect the Court's detailed Order and the significant burden it has imposed on Plaintiff through its legally and factually unsupported efforts to persuade the Court to give it a do-over.

## ARGUMENT

I. **Wexford's Motion for Reconsideration and Motion for Leave to Supplement are improper and vexatious and should be denied.**

At least one thing is evident from Wexford's Motions for Reconsideration and for Leave to Supplement: the documents that Wexford is fighting to keep from Plaintiff are relevant, substantive, and factual discussions by among senior Wexford officials of facts bearing on Wexford's provision of (and failures to provide) healthcare to prisoners. These are the kinds of *actually useful* documents that Wexford consistently tries to avoid producing by erecting hurdle after hurdle to routine discovery. And that is exactly what we see in Wexford's Motion for Reconsideration and for Leave to Supplement. Wexford's Motions are frivolous and should be denied.

Through its Motions on reconsideration, Wexford seeks to narrow the Court's ruling, accusing the Court of committing an error of "apprehension" of its privilege argument. Under the narrow and well-established rules governing such motions, there is absolutely no basis for the Court to reconsider its detailed 22-page discovery Order. *See, e.g., Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996) ("Reconsideration is not an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion."); *Reynolds v. Ahmed*, No. 21-cv-00345-SPM, 2021 WL 3772369, at *1 (S.D. Ill. Aug. 25, 2021) ("While motions to reconsider are permitted, they are disfavored, serving a limited function: to correct manifest errors of law or fact

or to present newly discovered evidence.") (internal quotations omitted); *Hellige v. Wal-Mart, Inc.*, No. 20-cv-455-DWD, 2020 WL 6149817, at *2 (S.D. Ill. Oct. 20, 2020) ("A motion for reconsideration is not an appropriate vehicle for raising new arguments or theories that could have and should have been raised before the Court's challenged ruling.").

Wexford's argument for reconsideration turns the standard for withholding documents based on any privilege upside down, arguing that Plaintiff failed to adequately pick apart Wexford's assertions of privilege. That is not how it works. The Court explained: "[a]s with the privilege asserted under the IMSA, ***it is on Wexford to establish that the work product privilege applies*** to … emails forwarding analysis done on behalf of Wexford to prepare to respond to expert report in the class action lawsuit *Lippert* . . . . ." Dkt. 212 at 8 (emphasis added). Plaintiff herself explained this burden in her first motion to compel. Dkt. 173 at 4 (citing *In re Grand Jury Proceedings*, 220 F.3d 568, 571 (7th Cir. 2000)). Wexford therefore knew that it was required to prove, both as a factual and legal matter, that a privilege shielded the documents it had withheld from production, and it had every reason to assert all legitimate arguments and evidence to satisfy that burden. As is evident from the Court's framing of the issue, and contrary to Wexford's assertions in its Motion, the Court fully appreciated and "apprehended" the types of documents at issue. The Court simply concluded that, as with the Illinois Medical Studies Act ("IMSA"), Wexford failed to meet its burden for withholding those documents. Dkt. 212 at 8.

In particular, the Court observed that "Wexford does not address the specific documents at issue in the privilege log or explain how the documents could have been generated specifically for the peer-review process and are protected under IMSA, while simultaneously prepared in anticipation of litigation, and therefore, also protected by work product privilege." *Id.* Wexford attempts to begin to do this in its Motion for Reconsideration and Motion for Leave, but that ship

has sailed. It has long since waived or forfeited these arguments. *See, e.g., McGreal v. Vill. of Orland Park*, 928 F.3d 556, 559 (7th Cir. 2019); *Baker v. Lindgren*, 856 F.3d 498, 503 (7th Cir. 2017) ("The district court correctly noted that arguments raised for the first time in a motion to reconsider are waived"); *In re Outboard Marine Corp.*, 386 F.3d 824, 828 (7th Cir. 2004) (arguments waived if raised for the first time in a motion for reconsideration); *Art Akiane LLC v. Art & SoulWorks LLC*, No. 19 C 2952, 2021 WL 5163288, at *4 (N.D. Ill. Nov. 5, 2021) ("Arguments that a party fails to raise, or raises without development and citation to pertinent authority are, of course, waived or forfeited."). Even now, in making privilege arguments, Wexford presented the Court with nothing more than the say-so of its counsel in this case. Until the Motion for Leave, there was no affidavit about how these documents were created and why, and so even with Wexford's Motion for Reconsideration, there is nothing for the Court to consider. Wexford is also asking the Court to "reconsider" its rulings on attorney-client privilege where it never even asserted that privilege "due to an oversight." Dkt. 215 at 14. Wexford's Motion for Leave attempts to correct some of the shortcomings of its Motion for Reconsideration, but the proposed additions fall far short. An outrageously self-serving affidavit from Joe Ebbitt, a non-lawyer in Wexford's Risk Management Department, does not help. If anything, the Court would need to hear from Andrew Ramage, the lawyer who was allegedly directing the medical peer-review activities that Wexford once told this Court were privileged under IMSA, and the senior Wexford officials that provided the substantive input.

It is remarkable that Wexford is suggesting that it is Plaintiff who failed to adequately address privilege, when the entirety of Wexford's privilege argument in opposition to Plaintiff's motion to compel is contained in the following paragraph:

4

> Plaintiff also takes a broad swipe at Defendants' invocation of attorney work product privilege alongside invocation of the Illinois Medical Studies Act peer review privilege. However, several of the items on the Privilege Log attached to Plaintiff's Motion to Compel are very different types of documents from those addressed in Plaintiff's prior Motion to Compel. For instance, the Privilege Log encompasses communications from counsel regarding responding to the *Lippert* report. Such a document has different support for its work product privilege than the Mortality Worksheet on Craigory Green. Plaintiff's objections to work product privilege are conclusory in this motion to compel and do not identify any deficient document or privilege assertion in particular that the Court should overrule.

Dkt. 186 at 12. Plaintiff engaged with the arguments Wexford presented, which focused almost exclusively on IMSA. That was a strategic decision by Wexford, and one Wexford made despite being informed by Plaintiff's counsel in this case and others that IMSA does not apply in circumstances such as these. There is simply no basis for the do-over that Wexford is asking for. Enough is enough.

II.   **Even if the Court were to reach the merits of Wexford's Motion to Reconsider, which it should not, Wexford's arguments fail.**

In its response to Plaintiff's second motion to compel, Wexford reported to the Court that the *Lippert* documents should be protected under IMSA because "[t]he privilege as invoked by the Wexford Defendants supports the purpose for which [IMSA] was created by the Illinois Legislature—*encouraging peer review for medical practitioners*." *Id.* (emphasis added). Wexford again represented to the Court that these documents were created as part of a peer review function: "Plaintiff has not provided support for an argument that the state interest *in encouraging peer review for medical practitioners should be overruled* ...." *Id.* (emphasis added). In other words, when responding to Plaintiff's motion to compel, Wexford made representations to this very Court that the *Lippert* emails set forth in their privilege log were privileged under IMSA because they

5

showed Wexford using the *Lippert* report to improve care. Now that the Court has ruled that IMSA does not apply to this case, Wexford tells the Court that these earlier statements were false: "The purpose of these documents was to aid in litigation and anticipation of litigation only ***and for no other purpose***." Dkt. 215 (emphasis added). Thus, through its request for a do-over, Wexford is making the shocking representation to the Court and Plaintiff that its earlier invocation of IMSA was in bad faith because, really, these communications were ***never*** made as part of any peer-review function (the sole purview of IMSA) and were instead ***exclusively*** about defending against claims made against a different entity (the IDOC). *See, e.g.,* 735 ILCS 5/8-2101 (protecting information "used in the course of internal quality control or of medical study *for the purpose of* reducing morbidity or mortality, or for improving patient care") (emphasis added); *Webb v. Mount Sinai Hosp. & Med. Ctr. of Chi.*, 807 N.E.2d 1026, 1033-34 (Ill. App. Ct. 2004) (IMSA covers only documents generated as part of a peer-review committee "engaged in the peer-review process" and does *not* protect documents created "*for the purpose* of rendering legal opinions or to weigh potential liability risk" (emphasis added)); *see also Frigo v. Silver Cross Hosp. & Med. Ctr.*, 876 N.E.2d 697, 718 (Ill. App. Ct. 2007) (same).[1]

This Court should reject Wexford's untimely about-face. This Court appropriately decided Plaintiff's motions to compel based on Wexford's factual representations that these communications were made as part of a peer-review process (and *not* for a litigation purpose). *See* Dkt. 212 at 8. The Court decided that the IMSA privilege did not apply in this federal case. This Court should not permit Wexford, having lost the first trial balloon, to raise another one and see

---

[1] As Wexford notes in its Motion for Reconsideration, Plaintiff had previously pointed out to Wexford and the Court that the IMSA privilege and the work-product doctrine are mutually exclusive. Dkt. 173 at 9; Dkt. 184 at 12; *see also* Dkt. 212 at 8. Wexford argues there was nothing wrong with invoking "alternative bases" for privilege, Dkt. 215 at 13, but Wexford's invocation of these privileges is not based on alternative legal arguments but rather ***alternative facts***—factual assertions that directly contradict one another—that Wexford has presented to the Court at different times to suit its goal of avoiding its discovery obligations.

6

whether it will fly better than the first—particularly when permitting it to do so would be tantamount to condoning Wexford's serial misrepresentations to the Court about the nature of its documents and its intent in creating them. *See, e.g., Art Akiane*, 2021 WL 5163288, at *1 ("Motion practice is not a series of trial balloons where you [submit] what you think is sufficient, [you] see how it flies, and if it does not, you go back and try again. If that is the way the system worked we would have motion practice going on forever." (quoting *Hansel 'N Gretel Brand, Inc. v. Savitsky*, 1997 WL 698179, at *2 (S.D.N.Y. 1997))).

Even by their own terms, Wexford's Motion for Reconsideration and proposed supplement are insufficient to establish the privileges it now asserts. Wexford's Motion contains absolutely no evidentiary support for its many factual assertions, and the proposed supplement provides only a declaration from Wexford's Director of Risk Management that the communications (many of which did not include him) are privileged based on an "agreement between IDOC and Wexford that such communications would be . . . not discoverable[.]" Dkt. 217 ¶ 16.[2] Of course, saying that a company created documents with an understanding that it would never produce them does not make them privileged. *See Slaven v. Great Am. Ins. Co.*, 83 F. Supp. 3d 789, 794 (N.D. Ill. 2015).

Even if Wexford's assertion of a joint defense agreement with the IDOC is credited (and for many reasons, this late assertion should not be credited),[3] the common interest doctrine does

---

[2] Notably, neither the IDOC nor the IDOC Defendants have ever sought to protect these documents from production in this case. *See generally* Dkt. 185 (IDOC Defs.' Resp. to Pl.'s Mot. to Compel) (including no response to Plaintiff's request to compel production of the emails contained in Wexford's privilege log).

[3] Among other reasons set out in this pleading, there is good reason to believe that Wexford and the IDOC did not then and do not now have the "*identical*—not merely similar—*legal* interest" with regard to the *Lippert* litigation that assertion of the common interest doctrine requires. *McCullough v. Fraternal Order of Police, Chi. Lodge 7*, 304 F.R.D. 232, 239 (N.D. Ill. 2014). Among other things, Wexford was not a defendant in the *Lippert* lawsuit at the time the emails at issue occurred, and it is reasonable to expect that its interests differed substantially, both as a factual and legal matter, from the interests of the IDOC (who was a litigant). Certainly Wexford, who bears the responsibility to prove the existence of the common interest, has offered nothing other than a conclusory statement by Ebbitt that there was an unwritten joint defense agreement.

not *create* any privilege at all. *In re Grand Jury Subpoenas, 89-3 & 89-4*, 902 F.2d 244, 249 (4th Cir. 1990). Instead, the common interest doctrine serves only to protect otherwise privileged documents from disclosure by virtue of the fact that they have been shared with a third party who shares a common interest (a fact that would normally otherwise break the privilege). *United States v. BDO Seidman, LLP*, 492 F.3d 806, 816 (7th Cir. 2007). Moreover, the common interest doctrine only protects documents and communications "with the *attorney* of the member of the community of interest" and not non-counsel members like Louis Shicker (the IDOC's Chief of Medical Services), who appears on various emails throughout Wexford's privilege log. *McCullough*, 304 F.R.D. at 239.

If the Court is inclined to consider or credit Ebbitt's declaration (produced to Plaintiff only when it was filed as a corrected exhibit to Wexford's Motion to Supplement), it must be subjected to adversarial discovery. Indeed, if Wexford is permitted to advance brand new arguments and evidence regarding these documents made only after this Court ordered them produced based on Wexford's failure to support its assertions of privilege (which it should not), this Court should address those arguments only after an evidentiary hearing where Ebbitt, Ramage, and various other participants in the emails are called to testify.[4]

---

[4] Courts in this Circuit hold evidentiary hearings to assess claims of privilege where factual findings and credibility determinations are, as they would be here, essential to the Court's ruling. *See, e.g., Hobley v. Burge*, No. 03 C 3678, 2004 WL 1687005, at *1 (N.D. Ill. July 26, 2004) ("Although JD provided an affidavit describing the maintenance of its documents relating to its representation of the City in the Burge proceedings, Judge Brown also determined that an evidentiary hearing was needed before she could rule on JD's assertion of work product protection."); *see also Fujitsu Ltd. v. Tellabs, Inc.*, No. 09 C 4530, 2013 WL 1405223, at *2 (N.D. Ill. Apr. 5, 2013) (rejecting an assertion of the attorney-client privilege based on evidence elicited during an evidentiary hearing on the matter); *Zepter v. Dragisic*, 237 F.R.D. 185, 187 (N.D. Ill. 2006) (setting an evidentiary hearing to determine whether an accountant-client privilege applied to certain information sought by the plaintiff).

Plaintiff believes such an evidentiary hearing would undercut the assertions made by Wexford in its motions and by Ebbitt in his declaration. For example, although Wexford now claims it reviewed and assessed the 2014 *Lippert* report, including review of mortality reviews, only for the purpose of defending against anticipated litigation (and for no other purpose), one of the main participants in the emails at issue testified differently at a recent trial. Stephen Ritz, Wexford's Corporate Director for Utilization Management, testified that the *Lippert* report raised "serious concerns that Wexford took seriously." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 227-28 (7th Cir. 2021) (cleaned up). Dr. Ritz also testified that he did not review the *Lippert* report in detail but had been made aware by the IDOC that "there were concerns that were raised in these reports; yes." *Id.* at 253 (Wood, J., dissenting). Dr. Ritz should be made to explain how Wexford could credibly contend that its review of and response to the *Lippert* report was solely for the purpose of litigation if, as he testified, Wexford took the concerns set out in the report seriously, as a matter of improving its care for prisoners.

The myriad of issues pointed out above serves only to underscore what Plaintiff has set out in Section I: parties have a responsibility to meet their burden *before* a court decides an issue, and not raise new arguments and positions that could have been advanced before only after losing. If this Court entertains the substance of the new arguments set out in Wexford's Motion for Reconsideration and Motion to Supplement, it will only serve as encouragement for Wexford to further obstruct discovery in this and other cases, knowing that it can offer only the most paltry of excuses at first because it will get a second bite at the apple if the Court appropriately holds it to its burden.

9

Wexford's motions on reconsideration should be denied. Without further delay, Wexford must produce the documents the Court has already ordered produced as well as any other similarly responsive documents that it is withholding based on the same rejected assertions of privilege.

### III. Wexford's Motion for Extension of Time should be denied along with Wexford's narrowing construction of the Court's Order.

Reading Wexford's Motion for Extension of Time, one might have the impression that Wexford has made substantial progress on its required productions and only needs a bit more time to identify and produce a subset of the documents that the Court has ordered Wexford to produce. In reality, Wexford produced just 484 pages. ***Ninety-six percent*** of those pages are versions of policy manuals, which should require almost no effort from Wexford to identify and produce. The overwhelming majority of Wexford's production obligation remains outstanding.

Plaintiff is extremely concerned that the Wexford Defendants are taking an implausibly narrow view of the Court's Order, one not supported by the Order itself or the document requests that underlie the Order. For example, Wexford indicates that it is in the process of compiling all "complaints ***in lawsuits*** against the individual Wexford defendants." Dkt. 214 at 2 (emphasis added). The problem is that the Court's Order regarding "complaints" is far broader than "complaints in lawsuits." For example, Request No. 13 asks for "Complaints" by prisoners alleging denial of hepatic or transplant procedures. "Complaint" is defined in Plaintiff's requests to include "any complaint or criticism relating to the job performance of any Defendant … regardless of the disposition" and is in no way limited to lawsuits, which Plaintiff can, with some effort, find on Pacer. Request No. 31, also subject to the Court's Order, requires a range of other types of complaints. Wexford is well aware of the scope of Plaintiff's requests for production. In fact, taking issue with the scope of Plaintiff's requests was central to Wexford's response to the motions to compel. Dkt. 186 at 7-8.

Accordingly, Plaintiff believes it necessary to summarize what is required by the Court's discovery Order, with reference to the underlying requests, as the Court did:

- **Requests regarding "Complaints."** For all complaint-related requests, "Complaint" is defined to include "any complaint or criticism relating to the job performance of any Defendant . . . regardless of the disposition of any resulting inquiry or investigation."

    - **Request No. 13**: All Documents relating to Complaints by prisoners alleging denial of either hepatic procedures and/or organ transplant procedures by the IDOC and/or Wexford since January 1, 2011.

    - **Request No. 31:** Complaints at Menard since January 1, 2011 regarding:

        a. Inadequate medical care or denial of medical care;

        b. Refusal or failure to arrange for evaluation or treatment by an outside healthcare provider;

        c. Refusal or failure to diagnose a serious medical condition;

        d. Refusal or failure to provide or facilitate evaluation for a transplant; and

        e. Refusal or failure to coordinate the medical care of a Menard prisoner.

- **Death Documents.**

    - **Request No. 15**: All Documents since January 1, 2011 relating to the deaths of any prisoner who died after the IDOC or Wexford declined, refused, or delayed an organ transplant.

    - **Request No. 32**: All Documents since January 1, 2010 relating to deaths of prisoners from liver disease <u>where Wexford is contractually responsible for providing medical care</u>. This request includes medical records, death investigations, and related correspondence. Wexford operates in at least ten states, and this request is <u>not</u> limited to Wexford's operations in Illinois.

    - **Request No. 33:** All Documents relating to deaths of Menard prisoners between January 1, 2010 and the present, excluding deaths caused by homicide.

- **Requests for Care by an Outside Healthcare Provider.**

    - **Request No. 34:** All Documents related to requests by Wexford or any of its employees or agents for evaluation, consultation, or treatment of prisoners for transplant procedures by an outside healthcare provider. This includes referral requests, collegial review, and similar processes.

- **Documents listed in rows 6-18 of Wexford's privilege log**. Wexford has resisted producing these documents for the reasons in its Motion for Reconsideration, which Plaintiff has addressed above. Dkt. 215.
- **Wexford Policy Manuals**. Wexford's Utilization Management Policies/Guidelines; Wexford's Provider Handbook; Wexford's Quality Management Program. It appears that these documents have been produced.

Wexford fought to avoid this discovery and failed, though it did manage to delay its response to Plaintiff's requests by a year. Wexford must comply with the Court's Order, and not a self-servingly, unreasonably narrow interpretation of that Order, and it must do so now. Based on its extension request, however, it appears that Wexford has gone to great lengths to oppose Plaintiff's requested discovery without having first investigated the responsive documents that Plaintiff requested. It is hard to understand how Wexford could have undertaken a good-faith investigation of Plaintiff's allegations without at least locating and reviewing a portion of the documents requested, although that seems to be the troubling reality.

Plaintiff has been stymied by Wexford's tactics in discovery, which include forcing Plaintiff to pursue it endlessly and to move to compel nearly every document that is not part of the defined set of materials that Wexford is comfortable producing, *i.e.*, endless pages of unusable PDF versions of Excel spreadsheets that pad Wexford's productions by transforming every single-page Excel into a several-hundred page document, while imposing hurdles like "relevance" redactions, objections under inapplicable privileges, and the like.

Due to Wexford's pattern of obstruction and delay, Plaintiff is now once again forced to brief issues that should have been resolved among the parties months or even a year ago and have been conclusively resolved by the Court's Order. The Court should order Wexford to immediately produce documents sufficient to demonstrate a good-faith effort at compliance with the Court's Order.

**IV. Wexford should pay Plaintiff's reasonable attorney's fees incurred in responding to Wexford's factually and legally unsupported filings.**

Rule 37(b)(2) provides that when a party fails to obey an order to provide discovery, the Court "must order the disobedient party . . . to pay the reasonable expenses, including attorney's fees, caused by the failure" unless the failure was substantially justified or other circumstances make the award unjust. Fed. R. Civ. 37(b)(2) (emphasis added).

Wexford's conduct is not a matter of negligence in litigation. Litigation is difficult, and mistakes happen. Here, however, Wexford argued to Plaintiff and then to the Court that documents addressing *Lippert* were privileged because Wexford used the criticisms of its and the IDOC's conduct to improve care. It has now, a year later and after an adverse ruling, turned around to argue that its *Lippert*-related documents were generated for the sole purpose of protecting itself and the IDOC from liability, and at the direction of counsel. That 180-degree reversal demonstrates bad faith, either in its prior arguments that frustrated the progress of this case for at least a year or in the untimely and non-cognizable arguments and factual representations it is making now.

Wexford made zero effort to confer with Plaintiff on a path forward in response to the Court's discovery Order. Instead, it filed more than 50 pages of legally unsupported motions, briefing, and exhibits that has forced Plaintiff to sift through the mess Wexford filed and to respond in writing to adequately protect her interests. Though counsel for Plaintiff is filing this response promptly due to their upcoming obligations in other cases, Plaintiff's counsel has been forced to devote several days of work to review Wexford's submissions and production, and to research and draft an appropriate response. This work has occupied Plaintiff's counsel for more than fifteen hours between Thursday, February 16 and Sunday, February 19. If the Court grants Plaintiff's request for fees, Plaintiff is prepared to promptly submit a detailed fee petition along with declarations demonstrating her counsel's billing rate.

13

Plaintiff does not make this request for fees lightly. Plaintiff also harbors no ill-will toward counsel for Wexford, who we believe is acting here at Wexford's command. Wexford itself (and certainly not Plaintiff) should be forced to bear the costs of its bad-faith conduct in this case. If it is not forced to do so, and no matter the verbal reprimands, Wexford will continue to litigate as if it were subject to different rules than all other federal litigants. We ask the Court to impose real financial costs on Wexford to help disabuse it of that misapprehension.

## CONCLUSION

For the foregoing reasons, as well as those set out in Plaintiff's briefing on its motions to compel (Dkts. 173 and 184) and the Court's discovery Order (Dkt. 212), all of Wexford's Motions should be denied. Further, Plaintiff should be awarded her reasonable fees incurred in responding to Wexford's Motions.

Respectfully submitted,

/s/ Howard Kaplan
Howard Kaplan
Attorney for Plaintiff

Howard Kaplan
Sarah Grady
KAPLAN & GRADY LLC
1953 N. Clybourn Ave., Suite 274
Chicago, IL 60614
(312) 852-2641
howard@kaplangrady.com
sarah@kaplangrady.com

## CERTIFICATE OF SERVICE

      I, Howard Kaplan, an attorney, certify that on February 20, 2023, I caused the foregoing to be filed using the Court's CM/ECF system, which effected service on all counsel of record.

                                        /s/ Howard Kaplan
                                        Howard Kaplan
                                        Attorney for Plaintiff